Sean K. Claggett
Nevada Bar No. 8407
Joseph N. Mott
Nevada Bar No. 12455
4101 Meadows Lane, Ste. 100
Las Vegas, Nevada 89107
(702) 655-2346 – Telephone
(702) 655-3763 – Facsimile
sclaggett@claggettlaw.com
joey@claggettlaw.com
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| KELLY WOODBURN, THOMAS WOODBURN, and JOSHUA RODRIGUEZ individually and on behalf of all others similarly situated,<br><br>                  Plaintiffs,<br><br>vs.<br><br>CITY OF HENDERSON; DOES I through V, inclusive; and ROE CORPORATIONS I through V, inclusive,<br><br>                  Defendants. | Case No.: 2:19-CV-01488-JAD-VCF<br><br>**SECOND AMENDED COMPLAINT** |

1. Violations of the Fair Labor Standards Act – Unpaid Overtime

(Individually and On Behalf of All Others Similarly Situated)

## SECOND AMENDED COMPLAINT

Plaintiffs **KELLY WOODBURN, THOMAS WOODBURN**, and **JOSHUA RODRIGUEZ**, (hereinafter collectively referred to as "Plaintiffs") individually and on behalf of all others similarly situated, through their counsel of record, Joseph N. Mott of CLAGGETT & SYKES LAW FIRM, hereby Complain against Defendant **CITY OF HENDERSON,** as follows:

## THE PARTIES, JURISDICTION, VENUE, AND INTRODUCTION

1.      Plaintiff **KELLY WOODBURN** was at all relevant times a resident of and employed in Clark County, Nevada.

2.      Plaintiff THOMAS WOODBURN was at all relevant times a resident of and employed in Clark County, Nevada.

3.      Plaintiffs KELLY WOODBURN and THOMAS WOODBURN (hereinafter collectively referred to as "the Woodburns") are currently residents of Tennessee.

4.      Plaintiff JOSHUA RODRIGUEZ is, and was at all times relevant, a resident of and employed in Clark County, Nevada.

5.      Defendant CITY OF HENDERSON (hereinafter referred to as "Defendant" or "City of Henderson") was at all relevant times the political subdivision operating the Henderson Police Department and Henderson Corrections Division. The Henderson Police Department and Henderson Corrections Division are the government agencies tasked with staffing and operating the Henderson Detention Center located at 18 E Basic Rd., Henderson, NV 89015.

6.      The true names of Defendants DOES I through V and ROE CORPORATIONS I through V, their citizenship and capacities, whether individual, corporate, associate, partnership, or otherwise, are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names. Plaintiffs are informed and believe, and therefore allege, that these Defendants were individuals who were in some manner negligent towards Plaintiffs, acted

wrongfully and illegally towards Plaintiffs, caused injury to Plaintiffs, and otherwise damaged Plaintiffs. Plaintiffs are further informed and believe, and therefore alleges, that each of these Defendants are or may be legally responsible for the events referred to in this action and other events not mentioned in this action, and caused damages to Plaintiffs including, but not limited to, causing Plaintiffs to not be paid their lawful wages and overtime. Plaintiffs will ask leave of this Court to amend the Complaint to insert the true names and capacities of such Defendants when the same have been ascertained, and to join them in this action together with the proper charges and allegations.

7.      During the operative time period, Plaintiffs were employed by the City of Henderson as Corrections Officers and stationed at the Henderson Detention Center.

8.      The City of Henderson was, at all relevant times, Plaintiffs' employer, as that phrase is defined under the Fair Labor Standards Act.

9.      Plaintiffs have satisfied all administrative and jurisdictional conditions precedent to filing this Amended Complaint.

10.     Plaintiffs' Amended Complaint states a controversy over which this Honorable Court has jurisdiction and venue is proper.

## **FACTUAL ALLEGATIONS**

11.     Kelly Woodburn was employed by the City of Henderson as a Corrections Officer from November 2007 through July 2017, when she retired.

12.     Thomas Woodburn was employed by the City of Henderson as a Corrections Officer from September 2011 through July 2018, when he retired.

13.     Joshua Rodriguez has been employed by the City of Henderson as a Corrections Officer since April 2010.

14.     Upon information and belief, Plaintiffs allege the City of Henderson has employed dozens, if not hundreds, of corrections officers during the operative years and that the City of Henderson has not properly paid these corrections officers overtime wages and other wages owed for hours worked.

15.     Corrections Officers, such as Plaintiffs, were required to arrive at the Henderson Detention Center 30-45 minutes before the start of their shift to perform integral and indispensable job duties.

16.     Plaintiffs, and all others similarly situated, were not compensated for this pre-shift time.

17.     During this pre-shift time, Plaintiffs, and all others similarly situated, were required to perform the following integral and indispensable job duties:

a.      Corrections Officers must change into their mandatory work uniforms. These uniforms are an integral and indispensable component of the Corrections Officers' job, and Corrections Officers are reprimanded if they are not in their full uniform at the commencement of their scheduled shift.

b.      Corrections Officers must check the posted assignment sheet to determine which work station they are to report to.

c.      Depending on their assigned work station for the day, Corrections Officers may have to do all or some of the following: (a) check their firearm into the on-site gun locker prior to reporting for duty; (b) pick up keys to access certain areas of the detention center; and (c) pick up vehicles to utilize during their shift.

d.      Corrections Officers must check in with their supervisor for a pre-shift "head count".

e.      Corrections Officers must meet with the outgoing officer from their duty station for the day in order to de-brief and discuss any issues related to that specific duty station.

18.     Plaintiffs, and all others similarly situated, were made to complete these tasks prior to the start of their scheduled shift.

19.     Plaintiffs, and all others similarly situated, were reprimanded if these tasks were not completed prior to the start of their scheduled shift.

20.     Additionally, Corrections Officers, such as Plaintiffs, were required to stay at the Henderson Detention Center for 20-45 minutes following the end of their shift to perform integral and indispensable job duties.

21.     Plaintiffs, and all others similarly situated, were not compensated for this post-shift time.

22.     During this post-shift time, Plaintiffs, and all others similarly situated, were required to perform the following integral and indispensable job duties:

a.    Corrections Officers must de-brief incoming Corrections Officers to discuss their duty station and address any issues related to that specific duty station.

b.    Depending on their assigned work station for the day, Corrections Officers may have to do all or some of the following: (a) pick up their firearm from the on-site gun locker; (b) drop off keys; and (c) drop off vehicles.

c.    Corrections Officers must change out of their mandatory work uniforms.

23.    Plaintiffs, and all others similarly situated, were made to complete these tasks following the conclusion of their scheduled shift.

24.    Plaintiffs, and all others similarly situated, were reprimanded if these tasks were not completed following the conclusion of their scheduled shift.

25.    In all, Plaintiffs, and all others similarly situated, were made to work an additional 50 to 90 minutes per shift in uncompensated time.

26.    Plaintiffs allege, on their behalf and on behalf of all others similarly situated, that the City of Henderson failed to pay Corrections Officers overtime for each applicable hour worked in violation of the Fair Labor Standards Act.

27.    Plaintiff Kelly Woodburn worked for the City of Henderson as a Corrections Officer at the Henderson Detention Center from on or about November 2007 to July 2017. Her rate of pay was approximately $44.11 per hour as of the last day she worked. During her ten year career with the City of

Henderson, Plaintiff Kelly Woodburn worked a variety of different shifts and was assigned to a variety of different job posts. For instance, she worked the following shifts dating back to 2013:

a.     From August 2016 through July 2017, she was assigned to the "Days B" shift which ran from 7:00 a.m. – 7:00 p.m. This shift alternated between 3 days one week and 4 days the next. She routinely worked at least 86 hours over a two-week pay period (not counting the hours she worked without compensation).

b.     From August 2015 through August 2016, she was assigned to the "Days A" shift which ran from 7:00 a.m. – 7:00 p.m. This shift alternated between 3 days one week and 4 days the next. She routinely worked at least 86 hours over a two-week pay period (not counting the hours she worked without compensation).

c.     From August 2014 through August 2015, she was assigned to the "Graves A" shift which ran from 7:00 p.m. – 7:00 a.m. This shift alternated between 3 days one week and 4 days the next. She routinely worked at least 86 hours over a two-week pay period (not counting the hours she worked without compensation).

d.     From August 2013 through August 2014, she was assigned to the "Graves B" shift which ran from 7:00 p.m. – 7:00 a.m. This shift alternated between 3 days one week and 4 days the next. She routinely worked at least 86 hours over a two-week pay period (not counting the hours she worked without compensation).

28.     Plaintiff Kelly Woodburn spent an average of 60 minutes or more pre- and post-shift performing required work activities, as described above, off the clock and without compensation, each and every shift worked. Thus, because Defendant required Plaintiff Kelly Woodburn to work at least 60 minutes of uncompensated work each and every shift worked, at the required overtime rate of pay of one and one half times her regular rate of pay of approximately $66.17 (44.11 x 1.5) for 1 hour of overtime, she is owed approximately $66.17 for each shift worked, or at least $12,042.94 per year. These calculations do not take into account unscheduled shifts which Plaintiff Kelly Woodburn worked, such as call-offs, etc.

29.     Plaintiff Thomas Woodburn worked for the City of Henderson as a Corrections Officer from on or about September 2011 through July 2018. His rate of pay was approximately $38.11 per hour as of the last day he worked. During his seven year career with the City of Henderson, Plaintiff Thomas Woodburn worked a variety of shifts and was assigned to a variety of different job posts. For instance, he worked the following shifts dating back to 2013:

a.     From August 2017 through August 2018, he was assigned to the "Graves B" shift which ran from 7:00 p.m. – 7:00 a.m. This shift alternated between 3 days one week and 4 days the next. He routinely worked at least 86 hours over a two-week pay period (not counting the hours he worked without compensation).

b.     From August 2016 through August 2017, he was assigned to the "Days B" shift which ran from 7:00 a.m. – 7:00 p.m. This shift alternated

between 3 days one week and 4 days the next. He routinely worked at least 86 hours over a two-week pay period (not counting the hours he worked without compensation).

c. From August 2015 through August 2016, he was assigned to the "Graves A" shift which ran from 7:00 p.m. – 7:00 a.m. This shift alternated between 3 days one week and 4 days the next. He routinely worked at least 86 hours over a two-week pay period (not counting the hours he worked without compensation).

d. From August 2014 through August 2015, he was assigned to the "Graves A" shift which ran from 7:00 p.m. – 7:00 a.m. This shift alternated between 3 days one week and 4 days the next. He routinely worked at least 86 hours over a two-week pay period (not counting the hours he worked without compensation).

e. From August 2013 through August 2014, he was assigned to the "Graves A" shift which ran from 7:00 p.m. – 7:00 a.m. This shift alternated between 3 days one week and 4 days the next. He routinely worked at least 86 hours over a two-week pay period (not counting the hours he worked without compensation).

30. Plaintiff Thomas Woodburn spent an average of 45 minutes or more pre- and post-shift performing required work activities, as described above, off the clock and without compensation, each and every shift worked. Thus, because Defendant required Plaintiff Thomas Woodburn to work at least 60 minutes of uncompensated work each and every shift worked, at the required

1  overtime rate of pay of one and one half times his regular rate of pay of

2  approximately $57.17 (38.11 x 1.5) for .75 hours of overtime, he is owed

3  approximately $42.88 ($57.17 x .75) for each shift worked, or at least $7,804.16

4  per year. These calculations do not take into account unscheduled shifts which

5  Plaintiff Thomas Woodburn worked, such as call-offs, etc.

6      31.    Plaintiff Joshua Rodriguez has worked for the City of Henderson

7  as a Corrections Officer since April 2010. His current rate of pay is

8  approximately $48.74/hour. His most recent hourly rate of pay while working a

9  specialized assignment (through October 2020) was $51.64/hour. During

10 his eleven year career with the City of Henderson, Plaintiff Joshua Rodriguez

11 has worked a variety of shifts and was assigned to a variety of different job

12 posts/specialized assignments including Corrections Officer, Field Training

13 Officer, Corrections Intelligence Officer, and Corrections Intelligence/

14 Classifications Officer. He worked the following shifts dating back to 2010:

15      a.    From July 2010 through August 2016, he was assigned to

16 either the "Graves B" shift which ran from 7:00 p.m. – 7:00 a.m. or the "Days B"

17 shift which ran from 7:00 a.m. – 7:00 p.m.. These shifts alternated between 3

18 days one week and 4 days the next. He routinely worked at least 86 hours over a

19 two-week pay period (not counting the hours he worked without compensation).

20      b.    August 2016 through October 2020 he was assigned to the

21 weekend "Swings" shift as the Intelligence/Classification Officer which ran from 11:00

22 a.m. – 9:00 p.m.  This shift consisted of 4 days per week for each 2-week pay period.  He

routinely worked at least 86 hours over a two-week period (not counting the hours he worked without compensation).

      c.      Since October 2020, he. Has been assigned to the "Graves B" shift which runs from 7:00 p.m. – 7:00 a.m..  This shift alternates between 3 days one week and 4 days the next.  He routinely works at least 86 hours over a two-week pay period (not counting the hours he works without compensation).

32.     Plaintiff Joshua Rodriguez spent an average of one hour or more pre- and post-shift performing required work activities, as described above, off the clock and without compensation, each and every shift worked. Thus, because Defendant required Plaintiff Joshua Rodriguez to work at least 60 minutes of uncompensated work each and every shift worked, at the required overtime rate of pay of one and one half times his regular rate of pay of approximately $77.46 ($51.64[1] x 1.5) for 1 hour of overtime, he is owed approximately $77.46 ($75.00 x 1) for each shift worked, or at least $14,097.72 per year. These calculations do not take into account unscheduled shifts which Plaintiff Joshua Rodriguez worked, such as call-offs, etc.

33.     Defendant possesses evidence reflecting the precise number of overtime hours Plaintiffs, and all others similarly situated, worked.

---

[1] Although his current rate of pay is just under $50.00/hour, for the majority of the past three years, Rodriguez was paid $51.64/hour. Accordingly, for the purposes of this complaint and the calculations herein, $51.64 is used as his rate of pay.

34.    To the extent these records are unavailable, Plaintiffs, and all others similarly situated, may prove the hours they worked solely by their testimony. The burden then shifts to Defendant to disprove Plaintiffs', and all others similarly situated, testimony.

35.    All employers, including Defendant, are subject to record keeping requirements imposed by 29 C.F.R. § 516.2 and 29 U.S.C. §§ 211 and 216.

36.    Defendant has failed to make, keep, and preserve these records regarding Plaintiffs, and all others similarly situated, in violation of 29 C.F.R. § 516.2 and 29 U.S.C. §§ 211 and 216.

## COLLECTIVE AND CLASS ACTION ALLEGATIONS

37.    Plaintiffs bring this action on behalf of others similarly situated as a collective action pursuant to 29 U.S.C. § 216(b).

38.    The statute of limitations under the FLSA is 3 years for willful violations.

39.    The FLSA class is defined as follows: All persons who were employed by Defendant as Corrections Officers at any time during the applicable statute of limitations time period.

40.    Plaintiffs will fairly and adequately represent and protect the interests of the class and have retained counsel with experience litigating such claims.

41.    A collective action suit, such as this, is superior to other available means for fair and efficient adjudication of this lawsuit. The damages suffered by individual members of the collective may be relatively small when compared

to the expense and burden of litigation, making it virtually impossible for members of the collective to individually redress the wrongs done to them.

42.     Furthermore, even if members of the collective could afford individual litigation against the City of Henderson, it could and would be unduly burdensome to the judicial system. The collective action and class action are, therefore, the most efficient method by which to resolve these claims.

43.     With regard to the conditional certification mechanism under the FLSA, Plaintiffs are similarly situated to those that they seek to represent for the following reasons, among others:

        a.     Defendant employed Plaintiffs as hourly employees who did not receive pay for all hours that Defendant suffered or permitted them to work, and did not receive overtime premium pay of at least one and one half their regular rate of pay for all hours worked in excess of forty (40) hours in a workweek, or 80-hour variable workweek, or the applicable threshold as provided in 29 U.S.C. § 207(k). Plaintiffs, and those similarly situated, were scheduled and did work either 40 hours per workweek or 80 hours for a two-week work period, but were not compensated for the time spent performing the off the clock activities described above. The time spent performing these off the clock activities was in excess of the scheduled for, and worked 40 hours per workweek or 80 hours per two-week work period.

        b.     Plaintiffs' situations are similar to those they seek to represent because Defendant failed to pay Plaintiffs, and those similarly situated, for all time they were required to work, including time spent

performing off-the-clock activities, pursuant to a uniform policy, plan, and practice.

c.      Common questions of fact and law include, but are not limited, to the following: (1) Whether Defendant employed Plaintiffs, and those similarly situated, within the meaning of the applicable provisions of the FLSA; (2) Whether Plaintiffs, and those similarly situated, were expected, or mandated, to work in excess of 40 hours per workweek, or  80 hours per two-week work period, or in excess of the applicable threshold as provided in 29 U.S.C. § 207(k); (3) Whether Defendant knowingly failed to maintain and preserve accurate and true records of all hours worked and wages earned by Plaintiffs, and those similarly situated; (4) Whether Plaintiffs, and those similarly situated, have sustained damages and, if so, what is the proper measure of them.

d.      Upon information and belief, Defendant employs, and employed, in excess of 100 qualifying Corrections Officers within the applicable statute of limitations.

e.      Defendant knew or should have known its policies alleged herein were unlawful and that it owed employees this money, and has willfully failed to pay its employees properly. Indeed, paying employees for engaging in work related activities such as receiving assignments, picking up tools/gear, and passing down job related information are generally understood to be compensable activities and the failure to pay for such activities prior to the initiation of this action represents willful conduct on the part of the Defendant.

Defendant's actions and omissions giving rise to this complaint were thus not in good faith and were not based upon an informed, reasonable belief that Defendant's behavior was lawful.

44.    Notice of the pendency and any resolution of these actions can be provided to Collective Action members by email, mail, print, or internet publications.

### FIRST CLAIM FOR RELIEF

**Violations of the Fair Labor Standards Act, 29 U.S.C. § 207 –**

**Unpaid Overtime**

**(Individually and On Behalf of All Others Similarly Situated)**

45.    Plaintiffs incorporate by reference the balance of the Amended Complaint as though set forth fully in this claim for relief.

46.    29 U.S.C. § 207(a)(1) provides, in pertinent part, "Except as otherwise provided in this section, no employer shall employee any of his employees…for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

47.    29 U.S.C. § 207(k) provides as follows:

"No public agency shall be deemed to have violated subsection (a) of this section with respect to the employment of any employee in fire protection activities or any employee in law enforcement activities (including security personnel in correction institutions) if –

(1)    In a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of

(A)   216 hours, or

(B)   The average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days in calendar year 1975; or

(2)   In the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive days in his work period as 216 hours (or if lower, the number of hours referred to in clause (B) of paragraph (1)) bears to 28 days,

Compensation at a rate not less than one and one-half times the regular rate at which he is employed.

48.     Once the work day has begun, all time suffered or permitted by the employer to be worked by the employee is compensable at the employee's applicable rate of pay, whether scheduled or not.

49.     By engaging in the conduct described above, Defendant paid Plaintiffs, and all others similarly situated, $0 for pre- and post-shift work performed.

50.     Specifically Corrections Officers, such as Plaintiffs, were required to arrive at the Henderson Detention Center 30-45 minutes before the start of their shift to perform integral and indispensable job duties.

51.     Plaintiffs, and all others similarly situated, were not compensated for this pre-shift time.

52.     During this pre-shift time, Plaintiffs, and all others similarly situated, were required to perform the following integral and indispensable job duties:

a.      Corrections Officers must change into their mandatory work uniforms. These uniforms are an integral and indispensable component of the Corrections Officers' job, and Corrections Officers are reprimanded if they are not in their full uniform at the commencement of their scheduled shift.

b.      Corrections Officers must check the posted assignment sheet to determine which work station they are to report to.

c.      Depending on their assigned work station for the day, Corrections Officers may have to do all or some of the following: (a) check their firearm into the on-site gun locker prior to reporting for duty; (b) pick up keys to access certain areas of the detention center; and (c) pick up vehicles to utilize during their shift.

d.      Corrections Officers must check in with their supervisor for a pre-shift "head count".

e.      Corrections Officers must meet with the outgoing officer from their duty station for the day in order to de-brief and discuss any issues related to that specific duty station.

53.     Plaintiffs, and all others similarly situated, were made to complete these tasks prior to the start of their scheduled shift.

54.     Plaintiffs, and all others similarly situated, were reprimanded if these tasks were not completed prior to the start of their scheduled shift.

55.     Additionally, Corrections Officers, such as Plaintiffs, were required to stay at the Henderson Detention Center for 20-45 minutes following the end of their shift to perform integral and indispensable job duties.

56.     Plaintiffs, and all others similarly situated, were not compensated for this post-shift time.

57.     During this post-shift time, Plaintiffs, and all others similarly situated, were required to perform the following integral and indispensable job duties:

        a.      Corrections Officers must de-brief incoming Corrections Officers to discuss their duty station and address any issues related to that specific duty station.

        b.      Depending on their assigned work station for the day, Corrections Officers may have to do all or some of the following: (a) pick up their firearm from the on-site gun locker; (b) drop off keys; and (c) drop off vehicles.

        c.      Corrections Officers must change out of their mandatory work uniforms.

58.     Plaintiffs, and all others similarly situated, were made to complete these tasks following the conclusion of their scheduled shift.

59.     Plaintiffs, and all others similarly situated, were reprimanded if these tasks were not completed following the conclusion of their scheduled shift.

60.     In all, Plaintiffs, and all others similarly situated, were made to work an additional 50 to 90 minutes per shift in uncompensated time.

61.    By failing to compensate Plaintiffs, and all others similarly situated, for the off-the-clock activities described above, Defendant failed to pay Plaintiffs, and all others similarly situated, overtime for all hours worked in excess of 40 hours per workweek in violation of 29 U.S.C. § 207(a)(1) and in excess of the hours set forth in 29 U.S.C. § 207(k).

62.    Defendant has not satisfied its obligation to pay for all hours worked in excess of 40-hours per workweek and/or in excess of the hours set forth in 29 U.S.C. § 207(k) at one and one half times the employees' regular rate by the payment of money nor by the grant of compensatory time off as provided in 29 U.S.C. § 207(o).

63.    As set forth above, the time spent performing the pre-and post-shift work that is the subject of this action was performed after Plaintiffs, and all others similarly situated, had worked at least 40 hours in a workweek and/or 80 hours in a 2-week pay period. Therefore, the uncompensated work performed in question were performed during overtime hours for which Plaintiffs, and all others similarly situated, were denied overtime compensation by Defendant as a result of its unlawful pay practices.

64.    Defendant's unlawful conduct has been widespread, repeated, and willful. Defendant knew or should have known its policies alleged herein were unlawful and that it owed employees this money, and have willfully failed to pay its employees properly. Indeed, paying employees for engaging in work related activities such as receiving assignments, picking up tools/gear, and passing down job related information are generally understood to be

compensable activities and the failure to pay for such activities prior to the initiation of this action represents willful conduct on the part of the Defendant. Defendant's actions and omissions giving rise to this complaint were thus not in good faith and were not based upon an informed, reasonable belief that Defendant's behavior was lawful.

65.     Plaintiffs demand for themselves, and for all others similarly situated, that Defendant pay Plaintiffs, and all others similarly situated, one and one half times their regular hourly rate of pay for all hours worked in excess of 40 hours per week and/or in excess of the hours set forth in 29 U.S.C. § 207(k) during the relevant time period alleged herein, together with liquidated damages, attorneys' fees, costs, and interest as provided by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.     For an order conditionally certifying this action under the FLSA and providing notice to all potential members of the Collective so they may participate in this lawsuit;

2.     For an order appointing Plaintiffs as Representatives of the Collective and their counsel as Collective Counsel;

3.     All wages due Plaintiffs within the FLSA, including those sums alleged to have been improperly withheld or not paid, including overtime pay for all hours worked over 40 per week and/or in excess of the hours set forth in 29 U.S.C. § 207(k);

4.     Liquidated damages pursuant to 29 U.S.C. § 216(b);

5.      Reasonable attorneys' fees and costs incurred in filing this action;

6.      Pre-judgment and post-judgment interest, as provided by law, and;

7.      Such other relief the Court deems just.

### **JURY DEMAND**

Pursuant to the Seventh Amendment to the Constitution of the United States, as well as Article 1, Section 3 of the Constitution of the State of Nevada, Plaintiffs hereby demand a jury trial for each of their claims for relief.

DATED this 23rd day of April, 2021.

CLAGGETT & SYKES LAW FIRM

/s/  Joseph N. Mott

_____
Joseph N. Mott
Nevada Bar No. 12455
*Attorneys for Plaintiff*